UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

BRUCE J. REID,

     Plaintiff,

-vs-

JONATHAN S. SACK, MICHAEL H. MUI, and
SACK & SACK, LLP

     Defendants

----------------------------------------------------------------x

Index No.: 20-cv-01817

**COMPLAINT**

Bruce J. Reid ("Reid"), as and for his Complaint against Defendants Jonathan S. Sack ("Sack"), Michael H. Mui ("Mui") and Sack & Sack, LLP (the "Sack Firm" and collectively with Sack and Mui, "Defendants"), hereby alleges as follows:

## **INTRODUCTION**

1. The Sack Firm purports to be a "premiere" New York law firm representing "executives, managers and sales professionals" in actions against their employers. As the Sack Firm's co-founder and equity partner, Defendant Jonathan S. Sack supposedly has "20+ years of demonstrated results" and "live[s] and breathe[s]" his cases by a "personal mantra: Each client is treated like they are my first, last and only client." Defendant Michael H. Mui is Sack's so-called "protégé" who has purportedly "built a formidable reputation in the legal profession representing employees, executives and partners of all levels in all areas of employment law against the most reputable firms worldwide."

2. In 2015, Plaintiff Reid retained Defendants to represent him in a multi-million dollar wrongful termination action against his former employer. Despite their supposed stellar reputation and experience, Defendants proceeded to deceive and defraud Reid over the next five years about virtually every aspect of their purported prosecution of his case. They falsely told

Reid they had commenced a proceeding before FINRA months before it was actually filed. They concocted stories of supposed conversations with FINRA officials when FINRA declined to hear Reid's claim. They fabricated bogus excuses to explain delays encountered in prosecuting Reid's case caused solely by their inaction and inattentiveness. They falsely told Reid they had filed a complaint in New York state court when they did not. They invented purported discovery requests they never served and sanctions motions they filed. And they fabricated a court conference they supposedly attended that never took place.

3. When Reid discovered the fraud in early February 2020, he immediately discharged Sack, Mui and the Sack Firm. By then, the damage had been done. Statutes of limitations on claims Reid could have asserted have expired, and relief Reid could have secured is no longer available. This is to say nothing of the severe distress Reid has suffered by virtue of Defendants' outrageous and dishonest conduct. Accordingly, Plaintiff brings this action to recover the loss, damage and injury he has sustained -- and will continue to sustain -- as a direct and proximate result of Defendants' actions.

## PARTIES

4. Plaintiff Reid, during part of the time relevant to the events set forth below, was a resident of New Jersey. Reid currently resides in South Carolina.

5. Defendant Sack is a resident of New York, NY. Upon information and belief, Sack is a founding member, equity owner and partner of the Sack Firm, and, as such, had management responsibility over the lawyers of the Sack Firm and supervisory authority over Defendant Mui. Under New York's Rules of Professional Conduct (the "Rules"), a lawyer with management responsibility in a law firm shall make reasonable efforts to ensure that other lawyers in the law

firm conform to the Rules. Similarly, a lawyer with direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the supervised lawyer conforms to the Rules.

6. Defendant Mui is a resident of Port Washington, New York. Upon information and belief, Mui is an associate or partner of the Sack Firm.

7. Defendant the Sack Firm is a New York Limited Liability Company. The Sack Firm's offices are located at 70 East 55th Street, New York, NY.

## JURISDICTION AND VENUE

8. Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 as Plaintiff and Defendants are residents of different states. Therefore, complete diversity of citizenship exists. The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) and (2) as many of the substantial acts giving rise to the events and omissions described in this Complaint occurred within this District.

## FACTS

**Reid's Employment With ICAP**

10. In 2007, Reid was a highly successful broker when he executed an "Employment Agreement" with a company called ICAP Capital Market LLC, n/k/a Intercapital Capital Markets LLC ("ICAP"). As a broker with ICAP, Reid worked on the medium term "swap" desk and oversaw up to five accounts.

11. Reflecting his stature in the industry, ICAP agreed to pay Reid a base salary of $500,000; an incentive bonus based on his "Net Brokerage Revenue"; and a "one-time sign on bonus in the amount of $500,000." The term of the Employment Agreement was four years beginning December 1, 2007 through and including November 30, 2011.

12. In August 2010, Reid and ICAP entered into an Amendment to the Employment Agreement (the "First Amendment"). The First Amendment extended Reid's employment with ICAP to November 30, 2013.

13. In May 2012, Reid and ICAP entered into a Second Amendment to the Employment Agreement (the "Second Amendment"). The Second Amendment extended Reid's employment with ICAP to November 30, 2014, and also amended Reid's compensation structure as follows:

> "BASE SALARY:
>
> Effective April 1, 2012 - $500,000 for each full year of the Term, provided that the Employee produces Net Brokerage Revenues (as defined below) of at least $500,000 during each consecutive six (6) month period during the Term. If the Employee fails to produce such revenues, then effective December 1, 2013, his total compensation (Base Salary, Incentive Bonus and all other monies received by the Employee from the Company) ("Total Compensation") may be reduced immediately following such failure so that the ratio of Net Brokerage Revenue to Total Compensation is 2:1; provided, however that in no event shall Employee's Total Compensation be less than $375,000 for the applicable year. The application of this ration will be reviewed at the Company's discretion.
>
> "INCENTIVE BONUS:
>
> Effective April 1, 2012 – the Company shall also a pay to the Employee for each semi-annual period during the Term… or a portion thereof, an incentive bonus ("Incentive Bonus") calculated as the follows: (a) for the period beginning April 1, 2012 and ending March 31, 2013, an amount equal to forty-five percent (45%) of Employee's Net Brokerage Revenue (as defined below); and (b) for the period beginning April 1, 2013, through and including the end of the Term, an amount equal to fifty percent (50%) of Employee's Net Brokerage Revenue, which amounts… shall be reduced by the Base Salary paid to Employee during the applicable bonus period.

**The ICAP Investigations and Reid's Unlawful Termination**

14. In 2013, the United States Justice Department (the "Justice Department") and the Commodity Futures Trading Commission (the "CFTC") began investigating certain of ICAP's

trading practices (the "ICAP Investigations").  Like other brokers, Reid retained personal counsel (specifically, the law firm of Katten Muchin Rosenman LLP [the "Katten Firm"]), to represent him in connection with these inquiries.

15.     Reid cooperated fully in the ICAP Investigations, meeting on multiple occasions with representatives from the Justice Department and the CFTC.  However, Reid's cooperation did not sit well with ICAP and senior-level personnel.  During depositions and interviews with the Justice Department and the CFTC, Reid described ICAP's trading practices and identified ICAP executives who knew about and approved those practices.

16.     When ICAP learned about Reid's cooperative efforts, it demanded that Reid meet with ICAP executives, even threatening "discipline, including termination, for failing to cooperate."  By letter dated October 21, 2014, ICAP's outside counsel informed the Katten Firm that if "Mr. Reid does not meet with us within five (5) business days of the date of this letter, ICAP will terminate his employment for cause", supposedly for "violating company policies."

17.     The Katten Firm responded to these threats by letter dated October 24, 2014.  In that letter, the Katten Firm advised ICAP's counsel that:

> your letter and demand for another interview of Mr. Reid… appear to be little more than a pretext for retaliation against him.  In this regard, I note that 18 USC §1514A provides remedies where an employer discriminates against an employee for acting as a witness, providing information, or otherwise assisting a federal fraud investigation.

18.     Nevertheless, four days later, Reid was summarily discharged by ICAP under the guise of his supposed "failure to cooperate in an internal inquiry."  ICAP further informed Reid in a letter dated November 3, 2014 that it was strictly enforcing the non-competition provisions in the Employment Agreement.  Under those provisions:

> During the Term and for a period of 180 days following the later of the end of the Term or the last day of Employment hereunder or otherwise with the Company in any capacity and for any reason, Employee will not, in any manner, directly or indirectly, engage in a any business, in competition of the Company in which Employee was engaged directly or substantively during and portion of Employee's employment at the Company ("competitive business").

19. The consequences of ICAP's directive was not only to prevent Reid from finding other employment in the near term, but limiting his compensation to "1/12 of [his] annual Base Salary per month during the period of 180 days from termination of Employee's employment with the Company."

**Reid's Damages Resulting From ICAP's Termination**

20. ICAP's unlawful termination of Reid caused him millions of dollars in damages. First, the aggregate sum of "Net Brokerage Revenues" generated by Reid at the time he was terminated was $847,349.14. Under the Second Amendment, Reid was entitled to half of this sum, less his base salary, for a total of $340,341.00. ICAP's unlawful termination deprived Reid of this compensation.

21. Second, during the 180 days Reid was prohibited from securing employment in the brokerage industry, he would have generated Net Brokerage Revenues of at least $1.27 million based upon his prior trading activity. Half of that sum, less his base salary, totals approximately $510,000. ICAP's unlawful termination deprived Reid of this compensation as well.

22. Third, recognizing its obligation to compensate Reid's counsel in connection with the ICAP Investigations, ICAP paid the Katten Firm the attorneys' fees and expenses incurred by Reid prior to his termination. After his termination, however, ICAP cut-off those payments, forcing Reid to personally pay the Katten Firm in connection with the ICAP Investigations. That

sum totaled in excess of $70,000. Reid demanded that he be reimbursed this money and ICAP refused.

23. Finally, after Reid was able to secure other employment in mid-2015, his compensation paled in comparison to the compensation he earned during his tenure with ICAP. Specifically, between 2009 and 2014 while employed at ICAP, Reid's average yearly compensation was approximately $2.2 million. In contrast, Reid's average yearly compensation with his new employer between 2015 and 2018 was approximately $742,000. Thus, Reid's lost earnings were approximately $1.45 million per year totaling in the aggregate $5.8 million. ICAP's unlawful termination deprived Reid of this compensation.

24. In total, ICAP's retaliatory actions deprived Reid of approximately $6.7 million in unpaid reimbursements and lost compensation. With unpaid interest since 2014, that sum exceeds $8 million.

**The Sack Firm**

25. According to its website, the Sack Firm is "a premiere law firm located in New York City concentrating exclusively in employment law and commercial litigation." The firm purports to represents "executives, managers and sales professionals" in lawsuits against their employers.

26. On the Sack Firm's website, Sack boasts about his active involvement in each client's case. Supposedly, Sack "live[s] and breathe[s] my cases and operate[s] under a personal mantra: Each client is treated like they are my first, last and only client." Sack also purports to "help people in dire situations." At the "end of a case", he proclaims, "I know I have done everything I could to right the wrongs."

27. Defendant Mui is supposedly Sack's "protégé, a trial lawyer who joined the firm after earning his courtroom stripes as a prosecutor in The Bronx District Attorneys' Office." According to the Sack Firm's website, "[o]ver the last two decades, Michael has built a formidable reputation in the legal profession representing employees, executives and partners of all levels of employment against the most reputable firms worldwide."

**Reid's Retention of the Sack Firm**

28. In the summer of 2014, Reid reached out to the Sack Firm about pursuing claims against ICAP in connection with his wrongful termination. After an initial phone call, Reid emailed Sack on August 3, 2014, to say that he "would like to move forward with the attempt to gain my compensation and legal fees from Icap if you deem the case viable."

29. By email dated November 4, 2014, Reid reiterated his interest in retaining the Sack Firm and told Sack he "hope[s] the statute of limitations is not 1 year." That day, Sack advised Reid that "[b]reach of contract is 6 years. I am on trial. Book a time to meet in my office in the next several weeks."

30. Reid then began corresponding with Defendant Mui. In December 2015, Mui asked Reid to send him a timeline and documents relating to Reid's employment with ICAP.

31. In January 2016, Reid asked Mui whether he had "reviewed the information I sent you" and asked whether or how we should proceed." By email dated January 14, 2016, Mui replied that he was "almost done reviewing what you sent me" and suggested scheduling "a phone call for next week to discuss."

32. When Mui failed to respond to several follow up emails, Reid reached out to Sack. On February 12, 2016, Reid told Sack he was "trying to move forward w the action against icap

via Michael with no success" and asked Sack for "your position in regards to this business." Sack told Reid that he "[u]nderstood" and to "[g]ive me until next week."

33. The next week, Sack assured Reid that "[w]e are working on filing" and "suggest[ed] we sit down in the office next week." On February 24, 2016, Reid met with Mui at the Sack Firm's office in New York. At the meeting, Mui re-confirmed that the Sack Firm would pursue Reid's claims against ICAP and informed Reid about the contingent fee the Sack Firm would charge.

**Defendants' Lies and Delays Regarding the FINRA Arbitration**

34. Over the next year and a half, Defendants inexcusably delayed filing an arbitration proceeding on Reid's behalf and lied to him about when the arbitration had been commenced. Two days after their meeting on February 24, 2016, Mui told Reid he had reviewed the Employment Agreement and was going to "put together a FINRA complaint." Several weeks later, Reid asked Mui whether there was "anything else u need from me at the moment?". Mui replied: "Don't need anything else right now from you."

35. Mui then began making excuses about his delays in providing Reid with a draft complaint. On April 19, 2016, Reid asked Mui whether he had "been able to make any progress?..." Mui replied: "Yes. In the middle of depositions for the next couple of days. I'll try to have this ready for you to review after."

36. On April 29, 2016, Reid asked Mui "[h]ow we getting on?" and are we "[a]ny closer." Mui replied: "Yes, getting there. Next week for sure."

37. On May 9, 2016, Reid asked Mui "[w]here do we stand?" Mui replied: "I'm done with the 1st draft. Gave some edits to my assistant to input and then will forward to you this week."

38. When no draft arrived, Reid asked Mui whether we can "please try to move this along this week?" Mui responded: "Yes, she sent it back to me. I want to review before sending to you."

39. On May 23, 2016, Reid emailed Mui to say "[h]ate to be a nu[d]ge…but when we going to push this along?" Mui replied that day: "This week."

40. Three months after Mui told Reid he would "put together a FINRA complaint," Mui sent Reid a "first draft." Over the next ten days, Reid supplied Mui with information regarding his payments to the Katten Firm and commissions owed from ICAP.

41. Mui spent the next two months making excuses about ICAP's "by-laws" so he could "figure out the basis for an indemnification claim against ICAP." When Reid told Mui he was unsuccessful in getting the by-laws, Reid asked Mui on June 15, 2016: "What is the plan of attack Michael…you still trying to get these bylaws?" Mui replied that he was "on trial this week" and that he was having "Jane looking to see if she can come up with the bylaws." The following week, Mui told Reid he had "come up empty on the bylaws" and, again, on July 22, 2016, Mui told Reid he "had no luck whatsoever finding the by laws and I assume you've had no luck either." Mui added that he would "amend the claim to reflect that its based on information and belief and just finalize it."

42. Several weeks went by when Reid emailed Mui to say: "U alive? Quit? Fired?" Mui replied by making excuses about having "struck out with the by-laws" and told Reid: "Thk we should get the ball rolling on this either way?"

43. Almost two months went by when Mui began falsely telling Reid that a FINRA proceeding had been commenced. On September 26, 2016, Reid asked Mui "[w]hat happens next," to which Mui replied:

FINRA will process the claim. This typically takes them 2-3 weeks. Once they are done, they will serve the firm. The firm will have 60 days to respond (but may ask for an extension). In the meantime, we will be sent arbitrator resumes for potential arbitrators and I will rank and strike them.

44. When Reid asked on October 6, 2016, whether Mui had "heard anything?", Mui replied:

Nothing yet. It takes time for FINRA to process it. I'll let you know as soon as I hear something.

45. On November 21, 2016, Mui informed Reid that he "spoke to [FINRA] early last week" and that they "asked for additional copies of the claim so I had them prepared and sent in." Mui also sought to blame FINRA for the delay, telling Reid "[t]hese people suck at their jobs…"

46. The lies and false assurances continued into December 2016. On December 9, 2016, Mui told Reid that he "usually receive[s] some kind of letter from FINRA telling us of a due date for their Answer." Mui added that "[t]his doesn't mean they havent [sic] been served with it yet, just that I haven't received FINRA's normal communication about it yet." In a separate email that day, Mui told Reid that he had "confirmed that we're fully submitted." We're waiting for FINRA to send us potential arbitrator resumes and for the company's answer to our claim."

47. In early 2017, Reid asked Mui whether he had "[a]ny thoughts on our case." Mui advised Reid he would "call FINRA and find out what's going on."

48. On January 30, 2017, Mui told Reid he did not "control FINRA and they're competence." He also told Reid that:

I just got off the phone with FINRA. They're completely incompetent and for the first time, said there was an issue with the paperwork. I've called numerous times on your case and they have never told me that there was an issue in the past. This happens all the time with them.

We will clear up the issue with them and I was assured that the delays will be over.

49. In a separate email that day, Mui told Reid to "[t]rust me, I have every incentive to move this as quickly as possible." He also advised Reid "[t]hey're idiots over there but I will make sure I take care of this personally."

50. On April 7, 2017, Mui continued to cast aspersions on FINRA, telling Reid "[t]hey're idiots over there." He also assured Reid he had "made an appointment for Tuesday to meet with a case administrator and for me to watch them correctly process it."

51. On May 22, 2017, Reid asked Mui whether "we are making some progress…" Mui responded by again lying to Reid, saying he had "filed it last week with FINRA personally."

52. In fact, Defendants did not file a Statement of Claim with FINRA until July 2017, months after Mui had repeatedly and falsely assured Reid the proceeding had commenced. Dated July 10, 2017, the Statement of Claim was signed by Defendant Sack. Sack also signed the "Uniform Submission Agreement" dated July 12, 2017.

53. On August 10, 2017, FINRA advised Sack that "Mr. Reid's claim is not eligible for arbitration in FINRA's forum." Upon hearing this news, Mui spent months assuring Reid he was communicating with FINRA about its decision and that he had "gone above the case administrator now and [was] speaking with the Director of FINRA." Mui also blamed FINRA for the mix-up, telling Reid that FINRA is "full of morons" and "full of idiots."

54. On November 13, 2017, Mui informed Reid he was "scheduled to speak with the Director of FINRA this week" and that Reid should "[s]tand by." Two weeks later, Mui told Reid that he "spoke to the Director of FINRA and he's supposed to follow up with me." Mui also agreed with Reid that the situation was "[i]nsane and incredibly frustrating" and that "I'm tired of waiting on FINRA also."

**Defendants' Misrepresentations Regarding the Supposed "State Court" Proceeding**

55. After lying to Reid about the FINRA arbitration, Defendants concocted a bogus story about a "state court" proceeding they never commenced. Specifically, in an email dated December 21, 2017, Mui told Reid that:

> Waiting on finra [sic] is getting us nowhere. Let's discus filing in court. You around for a call next Wednesday or Thursday?

56. In January 2018, Reid asked Mui whether there was "[a]ny progress?" Mui responded that he "filed [a state court complaint] in court last week and will send it to the process server for service." This was a lie.

57. On February 20, 2018, Reid told Mui he had "not heard from you" and was "braced for a setback…." Mui replied: "No setback. I'll follow up with the process server, it should have been served by now or will be imminently." These were also lies.

58. On March 13, 2018, Reid asked whether there was "[a]ny movement or progress on the suit?" Mui replied: "Yes. They were served with the complaint. I will be filing a request for a preliminary conference with the judge next week." These statements were also lies, as no complaint was ever filed and no request for a preliminary conference was ever made.

59. On September 14, 2018, when Reid inquired whether there "is any news related to the case?", Mui advised Reid that "[o]ur court date was rescheduled because it was improperly put on during a Jewish holiday." He also told Reid that defendants were "still delinquent with discovery" and that he would ask for "monetary sanctions" and "have the court compel them to cooperate with discovery." In fact, there was no "court date" scheduled; no discovery was ever served; and no motion for sanctions was ever made.

60. Several months went by before Mui advised Reid that "[w]e have a court date later this month" where he would ask the judge for sanctions because "[t]hey have not cooperated at all

in discovery." Mui then invented a "court conference" he supposedly attended on June 25, 2019, advising Reid that:

> I attended the court conference this morning. The other side sent a coverage attorney who was not prepared to discuss anything about the case. The court attorney was disappointed with their lack of cooperation and asked me if we could resolve the case. I told her that we would welcome any good faith opportunity to resolve this but that we needed a dance partner on the dance floor to make that happen. She said she will be reaching out to the other side to gauge their interest and to see whether or not a settlement conference at this time makes sense. Hopefully this is a positive development and we can gain some momentum.

61. Reid was understandably buoyed by the prospect of settlement and Mui's references to "positive development[s]" and "gain[ing] momentum" ("Wow...a light!!!" Reid replied). However, none of what Mui told Reid actually happened.

62. On February 4, 2019, Reid learned that Defendants had never filed a Complaint on his behalf in state court as they had represented for over two years. Reid further learned that Defendants had lied about the FINRA arbitration; lied about the supposed delays associated with the FINRA arbitration; and lied about discovery requests they had supposedly served and a court conference they supposedly attended. Two days later, Reid discharged Defendants as his attorneys.

## COUNT I

## **FRAUD**

63. Plaintiff repeats and realleges the foregoing as if fully set forth herein.

64. As alleged above, Defendants made representations to Plaintiff as to material facts that were false and misleading. These false and misleading representations included: (i) the status and timing of the filing of Plaintiff's Statement of Claim before FINRA; (ii) the supposed explanations for the delays in FINRA's processing of Plaintiff's Statement of Claim; (iii) the

supposed efforts undertaken by Defendants to remedy the delays associated with the FINRA proceeding; (iv) the filing of a purported complaint in New York state court on Reid's behalf; and (v) Defendants' filing of discovery requests, requests for sanctions and attendance at court hearings in connection with the fictitious state court proceeding.

65. By virtue of their experience and positions, Defendants knew or recklessly disregarded that the misrepresentations described in this Complaint were materially false and misleading.

66. Defendants' misrepresentations were made for the purpose of inducing Plaintiff to rely on them.

67. Plaintiff, who is not an attorney and has no legal training, had a right to rely and did rightfully rely on the representations of his attorneys, who purport to be highly experienced, respected and responsible lawyers in the field of employment law.

68. In addition, Plaintiff made repeated inquiries and exercised due diligence with regard to the status of Defendants' efforts on his behalf. These inquiries were repeatedly answered with assurances and promises from Defendants that, among other things, they: (i) were in regular contact with FINRA officials and would remedy any errors and delays; (ii) were "personally" taking care of ministerial and other procedural issues supposedly taking place in connection with the FINRA proceeding; (iii) had filed the necessary papers and documents when, in fact, they had not; and (iv) were detained from attending to Plaintiff's case because of illness or work on other matters. Thus, Plaintiff's reliance on Defendants' representations was fully justified.

69. Plaintiff was unaware of Defendants' false and misleading representations.

70. By virtue of Defendants' false and misleading representations, Plaintiff has sustained loss, actual damage and injury.

## COUNT II

### NEGLIGENT MISREPRESENTATION

71. Plaintiff repeats and realleges the foregoing as is fully set forth herein.

72. As his attorneys, Defendants had a legal and ethical duty to give correct information to Plaintiff regarding their efforts to initiate and prosecute claims on his behalf.

73. In complete disregard of these obligations, Defendants negligently made representations to Plaintiff that were materially false or misleading. These misrepresentations included: (i) the status and timing of the filing of Plaintiff's Statement of Claim before FINRA; (ii) the supposed explanations for the delays in FINRA's processing of Plaintiff's claim; (iii) the supposed efforts undertaken by Defendants to remedy the delays associated with the FINRA proceeding; (iv) the filing of a purported complaint in New York state court on Reid's behalf; and (v) Defendants' filing of discovery requests, requests for sanctions and attendance at court hearings in connection with the fictitious state court proceeding.

74. The information supplied to Plaintiff was known by Defendants to be desired by Plaintiff for a serious purpose and intended by Defendants for Plaintiff to rely and act upon it.

75. Plaintiff reasonably relied on these misrepresentations to his detriment.

76. By virtue of the foregoing, Plaintiff has sustained loss, actual damage and injury.

## COUNT III

### LEGAL MALPRACTICE

77. Plaintiff repeats and realleges the foregoing as if fully set forth herein.

78. Plaintiff retained Defendants to act as his attorneys and, thus, there was an attorney-client relationship between Plaintiff and Defendants.

79. As his attorneys, Defendants owed Plaintiff legal and ethical duties to, among other things: (i) provide competent representation to Plaintiff; (ii) act with reasonable diligence and promptness in representing Plaintiff; (iii) reasonably consult with Plaintiff about the means by which Plaintiff's objectives were to be accomplished; (iv) keep Plaintiff reasonably informed about his matter; (v) exercise independent professional judgment; and (vi) provide candid and honest advice.

80. As demonstrated by the foregoing allegations, Defendants repeatedly violated these duties and obligations to Plaintiff and failed to exercise the care, skill and diligence commonly possessed and exercised by members of the legal profession.

81. Defendants' negligence and malpractice were the proximate cause of loss, actual damage and injury sustained by Plaintiff, including: (i) the inability to assert certain claims that are now barred by the statutes of limitations; (ii) the inability to secure certain relief, such as reinstatement, because of the statute of limitations; and (iii) lost interest on the millions of dollars Plaintiff is owed by virtue of his wrongful termination.

## COUNT IV

## BREACH OF FIDUCIARY DUTY

82. Plaintiff repeats and realleges the foregoing as if fully set forth herein.

83. As his attorneys, Defendants owed fiduciary duties to Plaintiff of care, candor, loyalty and good faith.

84. As demonstrated by the foregoing allegations, Defendants breached these fiduciary duties by, among other things: (i) misrepresenting material facts to Plaintiff about the status of his case; (ii) failing to pursue his claims with care and due diligence; and (iii) concealing material information about his claims and the work they were purportedly performing on his behalf.

85. By virtue of Defendants' breaches of fiduciary duty, Plaintiff has sustained, loss, actual damage and injury.

## COUNT V

## JUDICIARY LAW § 487

86. Plaintiff repeats and realleges the foregoing as if fully set forth herein.

87. Judiciary Law § 487 provides in relevant part that an attorney who is "guilty of deceit or collusion, or consent to any deceit or collusion, with intent to deceive the court or any party … [i]s guilty of a misdemeanor , and … he [or she] forfeits to the party injured treble damages to be recovered in a civil action. A violation of Judiciary Law § 487 may be established "either by the defendant's alleged deceit or by an alleged chronic, extreme pattern of legal delinquency by the defendant."

88. As demonstrated by the foregoing allegations, Defendants engaged deceit and collusion, and consent to deceit or collusion, with intent to deceive Plaintiff Reid. Through their lies, delays and excuses to Plaintiff over a period of years, Defendants also engaged in chronic, extreme pattern of legal delinquency.

89. Based on the foregoing, Defendants are liable to Plaintiff for treble damages.

## COUNT VI

## INFLICTION OF EMOTIONAL DISTRESS

90. Plaintiff repeats and realleges the foregoing as if fully set forth herein.

91. Lawyers are fiduciaries who are obligated to be honest, candid and straightforward with their clients. Thus, lawyers are prohibited from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation. By their repeated lies, deceptions and bogus excuses to Plaintiff over a period of many years, Defendants engaged in extreme and outrageous conduct. That

conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is utterly intolerable in a civilized community.

93. Defendants' conduct was intended to cause, or in disregard of a substantial probability of causing, severe emotional distress.

93. Plaintiff has suffered, and will continue to suffer, severe emotional distress as a result of Defendants' conduct, including marital tension, sleepless nights and continuing stress and anxiety. That distress has only been exacerbated after Plaintiff recently learned that the promises, assurances and representations of Defendants -- his attorneys in whom he placed his utmost trust and confidence -- were blatant falsehoods.

94. There is a direct causal connection between Defendants' conduct and Plaintiff's loss, actual damages and injury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants for:

A. Actual and compensatory damages;

B. Punitive damages;

C. Treble damages;

D. Pre- and post-judgment interest;

E. Attorneys' fees and costs; and

F. Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY**

Plaintiff demands trial by jury on all issues.

Dated: March 2, 2020

        McLAUGHLIN & STERN, LLP

By:   /s/
Lee S. Shalov
Brett R. Gallaway
260 Madison Ave.
New York, NY 10016
(212) 448-1100

*Attorneys for Plaintiff*